WR-62,099-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/26/2015 11:05:57 AM
Accepted 3/26/2015 2:55:11 PM
ABEL ACOSTA
CLERK

No. _____

RECEIVED
COURT OF CRIMINAL APPEALS
3/26/2015
ABEL ACOSTA, CLERK

**IN THE**
**COURT OF CRIMINALAPPEALS**
**FOR THE STATE OF TEXAS**

**In re Robert Lynn Pruett,**

Petitioner,

FILED
COURT OF CRIMINAL APPEALS
3/26/2015
ABEL ACOSTA, CLERK

vs.

**William Stephens**,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent.

_____

**MOTION FOR LEAVE TO FILE**
**PETITION FOR WRIT OF PROHIBITION**
_____

**TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

Undersigned counsel represents David R. Dow in proceedings before this Court and yesterday filed an emergency motion for stay on Dow's behalf in cause number WR-61,939-01. As the Court is aware, Dow represents Robert Lynn Pruett who is scheduled to be executed on April 28, 2015. Dow is actively pursuing relief for Pruett and has filed two petitions

for a writ of certiorari in the Supreme Court of the United States, both of which are currently pending. *See Pruett v. Texas*, No. 14-8837 (U.S. filed Mar. 10, 2015); *Pruett v. Texas*, No. 14-8097 (U.S. filed Jan. 20, 2015).

Dow has prepared a petition for a writ of prohibition to be filed in this Court on behalf of Pruett. As the Court is aware, pursuant to the Court's order of January 14, 2015, Dow cannot practice in this Court on behalf of the clients he represented on that day (of which Pruett is one) without first obtaining leave. *In re Dow*, Nos. WR-61,939-01, WR-61,939-02, at *3 (Tex. Crim. App. Jan. 14, 2015).

Counsel therefore respectfully prays the Court grant Dow leave to file the petition for a writ of prohibition attached as Exhibit 1 on behalf of Robert Lynn Pruett.

Respectfully submitted,


/s/ Casie L. Gotro
Casie L. Gotro
State Bar No: 24048505
440 Louisiana, Suite 800
Houston, Texas 77002
Office: 832-368-9281
Fax: 832-201-8273
Email: Casie.Gotro@gmail.com

Nicole DeBorde
TBN: 00787344
712 Main St., Ste 2400
Houston, Texas 77002

Office: 713-526-6300
Fax: 713-228-0034
Email: Nicole@debordelawfirm.com

Attorneys for David Dow

Exhibit 1

No. _____


**IN THE
COURT OF CRIMINALAPPEALS
FOR THE STATE OF TEXAS**


**In re Robert Lynn Pruett,**

Petitioner,

vs.

**William Stephens**,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent.

_____

**PETITION FOR WRIT OF PROHIBITION**
_____

**CAPITAL CASE
MR. PRUETT IS SCHEDULED TO BE EXECUTED ON APRIL 28, 2015.**
_____

David R. Dow
Texas Bar No. 06064900
ddow@central.uh.edu
University of Houston Law Center
100 Law Center
Houston, Texas 77204-6060
TEL: (713) 743-2171
FAX: (713) 743-2131

**IDENTITY OF PARTIES AND COUNSEL**

So the members of this Honorable Court can determine disqualification and recusal, Relator certifies the following is a complete list of the parties and their attorneys in accordance with Texas Rule of Appellate Procedure 52.3(a).

1.    Respondent

       William Stephens
       Director, Texas Department of Criminal Justice,
       Correctional Institutions Division

2.    Counsel for Respondent

       Jefferson Clendenin
       Assistant Attorney General
       Criminal Appeals Division
       Texas Bar No. 24059589
       P.O. Box 12548, Capitol Station
       Austin, Texas 78711
       Tel. (512) 936-1600
       Fax (512) 320-8132
       Email jay.clendenin@texasattorneygeneral.gov

3.    Relator

       Robert Pruett
       TDCJ #999411
       Polunsky Unit
       3872 FM 350 South
       Livingston, TX  77351
       Jerry Hartfield
       Matagorda County Jail
       2323 Avenue E
       Bay City, Texas 77414

ii

4. Counsel for Relator

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
100 Law Center
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131
Email ddow@central.uh.edu

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .......................................................... ii

TABLE OF CONTENTS ................................................................................. iv

INDEX OF AUTHORITIES ............................................................................. vi

PETITION FOR WRIT OF PROHIBITION ......................................................1

STATEMENT OF THE CASE ........................................................................1

STATEMENT OF JURISDICTION ................................................................5

ISSUE PRESENTED ....................................................................................5

STATEMENT OF FACTS ..............................................................................6

    A.    Nagle's murder and the investigation ....................................................6

    B.    Corruption at the McConnell Unit ........................................................9

    C.    Trial.......................................................................................................10

    D.    Chapter 64 proceedings........................................................................12

ARGUMENT AND AUTHORITY...................................................................15

    I.    State statutes and guidelines mandated that the physical evidence be preserved properly until Mr. Pruett was either executed, died, or was released on parole. ........................................................16

    II.    Mr. Pruett had a state-created right to have the evidence tested. Fundamental fairness as well as state statutory law required the evidence be properly preserved. Because it was not, his execution would violate the Eighth and Fourteenth Amendments......................19

    III.    Mr. Pruett is clearly entitled to the relief sought and has no other remedy at law. ..................................................................20

PRAYER FOR RELIEF ..................................................................................21

CERTIFICATION PURSUANT TO TRAP 52.3(j)...............................................22

CERTIFICATE OF SERVICE ........................................................................22

CERTIFICATE OF COMPLIANCE.................................................................22

APPENDIX ...................................................................................... A-001

Exhibit A   Corrected Third Order Setting Execution, *State v. Pruett*, No.
            B-01-M015-0-PR-B (156th Dist. Ct., Bee County, Tex. Dec.
            17, 2014). ...................................................................... A-001

Exhibit B   U.S. Const. amend. XIV .............................................. A-004

Exhibit C   U.S. Const. amend. VIII............................................... A-006

Exhibit D   Pictures of evidence ................................................... A-008

Exhibit E   Tex. Code Crim. Proc. ch. 64...................................... A-014

Exhibit F   Tex. Code Crim. Proc. art. 38.43(c)(2)(A)................... A-021

Exhibit G   DPS Best Practices Document ..................................... A-027

Exhibit H   DPS Physical Evidence Handbook ............................... A-035

# INDEX OF AUTHORITIES

**Cases**

*Curry v. Wilson,*
    853 S.W.2d 40 (Tex. Crim. App. 1993)......................................................20

*Dist. Attorney's Office for Third Judicial Dist. v. Osborne,*
    557 U.S. 52 (2009) ........................................................................................19

*Ex parte Alba,*
    256 S.W.3d 682 (Tex. Crim. App. 2008) .....................................................5

*Ex parte Chi,*
    256 S.W.3d 702 (Tex. Crim. App. 2008) .................................................5, 20

*Ex parte Elizondo,*
    947 S.W.2d 202 (Tex. Crim. App. 1996)......................................................20

*Ex parte Fuller,*
    No. WR-16,531-09, 2014 WL 1328345 (Tex. Crim. App. Arp. 2, 2014) ......5

*Pruett v. State,*
    No. AP-77,037, 2014 WL 5422573 (Tex. Crim. App. Oct. 22, 2014)..........15

**Statutes**

Tex. Code Crim. Proc. art. 38.43 ..................................................................... 15-17

Tex. Code Crim. Proc. ch. 64. .................................................................. 15-16, 19

**Other authorities**

Associated Press, *4 state corrections officers face felony bribery charge: Guards who worked at Beeville-area state prisons accused of agreeing to launder supposed drug money for convicts*, Corpus Christi Caller Times, Jan. 27, 2000......9

*DNA Evidence:  What Law Enforcement Officers Should Know*, NI Journal, July 2003, at 10. .......................................................................................................17

Nate Blakeslee, *Shades of Gray: In Texas Prisons, It's Hard to Tell Who Your Enemies Are*, Austin Chron., Apr. 28, 2000 .............................................................9

U.S. Dep't of Commerce Technical Working Group on Biological Evidence Preservation, The Biological Evidence Preservation Handbook:  Best Practices for Evidence Handlers (2013)....................................................................... 17-18

No. _____


IN THE
COURT OF CRIMINALAPPEALS
FOR THE STATE OF TEXAS


**In re Robert Lynn Pruett,**

Petitioner,

vs.

**William Stephens**,
Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent.

_____

**PETITION FOR WRIT OF PROHIBITION**
_____

**TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

**STATEMENT OF THE CASE**

On April 23, 2002, Robert Lynn Pruett was convicted of killing Daniel Nagle, a correctional officer at the McConnell Unit, where Pruett was incarcerated. The State's theory at trial was that Pruett killed Nagle because he was upset that Nagle had written him up for carrying a sandwich into an area where inmates were not to take food. Torn pieces of the disciplinary report were found near Officer

Nagle's body. While blood on the disciplinary report was tested for DNA and found to belong to Officer Nagle, no other DNA profiles were developed from the report.

With no physical evidence linking Robert Pruett to Daniel Nagle's murder, the State was forced to rely on testimony from witnesses to persuade Pruett's jury to believe its theory and convict Pruett of capital murder. This testimony came from informants who were incarcerated with Mr. Pruett – many of whom, we now know, received special treatment in exchange for their testimony – and Nagle's co-workers.

Any number of people could have had a motive for wanting Daniel Nagle dead. Nagle was an important officer and was head of the correctional officers union. In the months leading up to his death, Nagle was in the process of preparing a lengthy grievance against the Texas Department of Criminal Justice (TDCJ) in which he complained, among other things, about corrupt senior officers. This complaint was subsequently revealed to be compelling; approximately one month after Nagle was killed, three correctional officers that worked at the McConnell Unit were indicted on felony bribery charges after being accused of agreeing to launder drug money for inmates.

Not only had Mr. Pruett consistently maintained his innocence from the time of his arrest, and not only did the State withhold evidence it had both coerced

2

witnesses favorable to Mr. Pruett not to testify while also offering secret deals to inmates in return for their testifying against Mr. Pruett, but the indictment of other corrections officers dramatically increased the plausibility that Mr. Pruett had been framed for a murder that had in fact been carried out by someone with animus toward Officer Nagle. Consequently, believing that the person who tore up the disciplinary report in an attempt to frame Robert Pruett for the murder of Daniel Nagle might have left a sufficient amount of epithelial cells on the report to allow for the creation of a DNA profile that would aid in identifying the actual murderer, undersigned counsel moved the trial court below to order testing using techniques not available at the time of Pruett's trial.

The results of that testing demonstrated that DNA was present on the report. However, after thirteen years of being stored in a manner inconsistent with the Texas Department of Public Safety's Physical Evidence Handbook, the report did not contain a sufficient amount of DNA to develop a complete profile. The pieces of the report were stored in – and continue to be stored in – plastic bags. The DPS Handbook mandates that evidence containing biological evidence not be kept in plastic bags. This is because plastic bags provide a growth medium for bacteria that may degrade DNA evidence. In short, by not following its own protocol, the State of Texas destroyed the evidence that could have exonerated Mr. Pruett. And the State now intends to execute Mr. Pruett, not because DNA evidence establishes

his guilt, but because, likely owing to the improper storage of the torn pieces of the report, there is no longer a sufficient amount of DNA to create a complete genetic profile that would allow identification of the actual murderer.

By enacting Chapter 64 of the Texas Code of Criminal Procedure, which permits post-conviction testing of potentially exculpatory biological evidence, the State of Texas created a procedure that vested Robert Pruett with a liberty interest in demonstrating his innocence. Yet by ignoring its own guidelines for the preservation of biological evidence and thereby allowing the pieces of the report to degrade to such a degree that they no longer contain adequate material to aid in identifying the actual murderer, Mr. Pruett's right to fundamental fairness, and to a reliable sentence, have been abridged.

On December 17, 2014, Judge Bert Richardson ordered the Director to "carry out [Pruett's] sentence of death by intravenous injection of a substance or substances in a lethal quantity sufficient to cause" Pruett's death. Corrected Third Order Setting Execution, *State v. Pruett*, No. B-01-M015-0-PR-B (156th Dist. Ct., Bee County, Tex. Dec. 17, 2014) (attached as Exhibit A). Allowing the State to execute Pruett only after the State's conduct has prevented Pruett from demonstrating his actual innocence would violate the Fourteenth Amendment's Due Process Clause (attached as Exhibit B) and the Eighth Amendment's protection against cruel and unusual punishment (attached as Exhibit C). Pruett

4

respectfully prays this Court enter an order prohibiting the Director from carrying out Judge Richardson's order because to execute Pruett would be to violate the mandates of the Eighth and Fourteenth Amendments.

## STATEMENT OF JURISDICTION

This Court has the authority to grant an application for writ of prohibition under Article 5, section 5 of the Texas Constitution. Because Pruett's claim does not challenge the legality of his conviction or sentence but rather challenges the constitutionality of his execution, it is properly presented in a petition for a writ of prohibition. *See Ex parte Chi*, 256 S.W.3d 702, 702-03 (Tex. Crim. App. 2008); *Ex parte Alba*, 256 S.W.3d 682, 685-87 (Tex. Crim. App. 2008).[1]

## ISSUE PRESENTED

The specific issue presented in this petition for a writ of prohibition is as follows: Because Texas has given death-sentenced inmates the right to pursue exoneration through the forensic testing of biological evidence, do either the Eighth or Fourteenth Amendments of the United States Constitution require the

---

[1] While *Chi* and *Alba* were concerned with the constitutionality of the lethal injection protocol, the claims raised in these cases are similar to Pruett's because it does not challenge the lawfulness of his conviction or sentence (though Pruett is challenging the constitutionality of both his conviction and sentence in parallel litigation). Pruett's claim challenges the subsequent act of the State not properly preserving evidence, which has interfered with his ability to prove his innocence, notwithstanding the lawfulness of the original trial proceedings. Moreover, this Court, in an unpublished opinion, has recently cited *Alba* for the proposition that a claim that alleges the State failed to properly preserve biological material is not cognizable in habeas. Ex parte Fuller, No. WR-16,531-09, 2014 WL 1328345, at *2 (Tex. Crim. App. Apr. 2, 2014).

5

State to properly preserve potentially exculpatory biological evidence in all capital cases, at least until sentence is carried out?

## STATEMENT OF FACTS

At the time the murder giving rise to this case occurred, Robert Pruett was serving a 99-year sentence. At the age of 17, he was convicted as a party to a murder committed by his father when he (Robert Pruett) was only 15 years old. (His father remains incarcerated for that offense.) Mr. Pruett himself had never been convicted of committing any violent offense at all, and from the time he was indicted for capital murder in this case, he steadfastly maintained his innocence.

### A. Nagle's murder and the investigation

Daniel Nagle, a correctional officer at the McConnell Unit was killed on December 17, 1999. Trial Tr. vol. 42: 236.[2] As will be discussed below, there were people with a motive to kill Officer Nagle, but they did not include Mr. Pruett.

The physical evidence collected during the investigation was found primarily in two separate locations. Officer Nagle was killed in the multipurpose room. The shank that was used to kill him was recovered from that room. Trial Tr. vol. 42: 274, 320. Pruett's prints were not found on the weapon. Trial Tr. vol. 44:

_____

[2] In this petition, the trial record will be abbreviated as Trial Tr. vol. [number]: [page number].

6

49. The only DNA profile that could be developed from the weapon was a match to Officer Nagle. Trial Tr. vol. 42: 337. A blue baseball cap was found in the toilet of the bathroom inside the multipurpose room. *Id.* at 322. No physical evidence connected this item to Mr. Pruett, either. Blood, identified as belonging to Nagle, was found on the bathroom floor. *Id.* at 322-23, 357. Keys were found on the bathroom floor. *Id.* at 327-28. No blood belonging to Pruett was anywhere on Nagle or his clothes, Trial Tr. vol. 44: 49, nor was any of Officer Nagle's blood found on Pruett or anything (including clothes) connected to him. Trial Tr. vol. 42: 346-47, 360. In other words, and in short, not a single iota of physical evidence connected Mr. Pruett to this crime.

The disciplinary report found near Officer Nagle's body had been torn into seven pieces and was scattered on the floor of the bathroom inside the multipurpose room. Trial Tr. vol. 42: 331-33. Officer Chris King collected the pieces of the report and placed them in paper sacks. *Id.* at 276-77.[3] The disciplinary report contained biological material. According to Lisa Harmon Baylor of the DPS lab in Corpus Christi, Texas (who performed forensic testing pretrial), one piece of the report had blood. *Id.* at 366. The blood that was tested

---

[3] It is not clear from the record or the pictures of the evidence whether Officer King placed the pieces of paper in plastic bags before placing them in the paper sacks or simply placed the pieces loose in brown paper sacks. It is clear, though, that by February 24, 2000, the evidence was being stored in plastic bags. Exhibit D (pictures of the evidence displaying the initials CJP dated 2/24/00 on many of the plastic bags containing the evidence).

on the disciplinary report belonged to Nagle. *Id.*; vol. 52: 83 (State's Ex. 52 at 6) (DPS lab report issued by Ms. Baylor on May 25, 2000).[4] Ms. Baylor accessed the evidence around the same time that she issued her report. Exhibit D (containing the initials LHB with the date 5/23/00 on many of the packages containing the evidence). Latent prints were found on several pieces of the disciplinary report. Trial Tr. vol. 43: 41-42; 52: 336 (Def.'s Ex. 6). The prints on the report did not belong to Pruett. Trial Tr. vol. 44: 49. None of the blood found anywhere in the multipurpose room belonged to Pruett. *Id.* Neither the blood on the report nor any of the other physical evidence collected from the multipurpose room identified Pruett as having been present there.

Other evidence as well was collected from inside the gymnasium and the bathroom inside the gymnasium. A pair of pants and a white towel were found in the trashcan of the bathroom inside the gymnasium. Trial Tr. vol. 42: 341. Another pair of pants was found in another trashcan outside of the bathroom. *Id.* While blood on these items of clothing belonged to Pruett, who had cut his finger earlier in the day (i.e., prior to the murder of Officer Nagle), none of Officer Nagle's blood was found on any of the clothes recovered from the gym area. *Id.* at

---

[4] While it is not clear in the record where the torn pieces of paper were stored between the date Ms. Baylor issued her report on May 25, 2000 and when the evidence was returned to her on June 5, 2013, Exhibit D (containing the initials LHB dated 6/5/13 on many of the packages containing the torn pieces of paper), it is clear the evidence was not preserved at the DPS lab. Counsel reasonably believes the evidence was stored in the Bee County Clerk's office during this time.

346-47, 360.

In addition to the evidence collected in these two areas, blood was found in the hallway leading to the gym.  Trial Tr. vol. 42: 342.  Analysts were unable to determine the source of the blood.  *Id.*

### B.    Corruption at the McConnell Unit

We now know with certainty that some members of the correctional officers union – of which Nagle was an officer – were corrupt and engaging in criminal activity at the time of Officer Nagle's murder.  Significantly, in the months leading up to his death, Officer Nagle was working on a lengthy grievance against TDCJ. This grievance complained (among other things) of corrupt senior officers at the Unit where he worked. *See* Nate Blakeslee, *Shades of Gray: In Texas Prisons, It's Hard to Tell Who Your Enemies Are*, Austin Chron., Apr. 28, 2000, *available at* http://www.austinchronicle.com/news/2000-04-28/77012/.

The grievance he was penning proved to be both shocking and poignant:  A month after Nagle was killed, three correctional officers that worked at the McConnell Unit were indicted on felony bribery charges after being accused of agreeing to launder drug money for inmates.  Associated Press, *4 state corrections officers face felony bribery charge: Guards who worked at Beeville-area state prisons accused of agreeing to launder supposed drug money for convicts*, Corpus Christi Caller Times, Jan. 27, 2000.  The evidence that some of these officers may

9

have had a motive to see Officer Nagle dead is not mere speculation; according to Scott Kimes, who was incarcerated at the McConnell Unit when Nagle was killed, correctional officers knew that Nagle had been attacked but allowed him to lay in the multipurpose room dying before they made any effort to save him. Clerk's R. vol. 1: 27-28.[5]

## C.    Trial

Pruett was indicted on June 26, 2001. Trial began on April 15, 2002. Because there was no physical evidence linking Pruett to Nagle, the State's evidence during guilt/innocence consisted almost entirely of testimony form correctional officers and inmates. Because no correctional officers claimed to have witnessed the attack, the only supposed eyewitness testimony came from inmate informants.

As one might expect, there were credibility issues with all these witnesses. The most common being that they were – in many cases – promised favorable treatment for testifying. The prosecutor agreed to drop an assault charge for Anthony Casey in exchange for his testimony. Trial Tr. vol. 42: 69. Harold Mitchell was told that prosecutors would write a favorable letter to the parole board for him if he testified. *Id.* at 246. The same promise was made to Michael

---

[5] Citations to the Clerk's record are to the record in the appeal pursuant to chapter 64 in this Court, Pruett v. State, No. AP-77,037, and are abbreviated as Clerk's R. vol. [number]: [page number].

Wayne Hall and Ross Alexander Kirkpatrick. Trial Tr. vol. 43: 36-37; 45: 169. Furthermore, there is reason to believe that these favorable letters were effective, as some of the witnesses – incarcerated at the time of Nagle's murder – had been paroled before Pruett's trial even began. Trial Tr. vol. 42: 22, 116-17.

Although the foregoing deals were revealed to defense counsel by the State, habeas counsel has subsequently discovered that the inmates who testified for the State received special treatment far beyond what was disclosed at trial. Notes from the SPU indicate that Harold Mitchell, for example, wanted to be transferred to another state in exchange for his testimony. Clerk's R. vol. 1: 60. According to Gary Jackson, who was at the McConnell Unit, Mitchell confirmed that he was in fact offered an interstate compact to testify. *Id.* at 62. This important detail was not revealed at Pruett's trial.

Moreover, many of the inmates who ultimately testified against Pruett initially claimed to have no knowledge of the crime or insisted that Pruett had nothing to do with the murder; they changed their stories over the course of the next year, only after being promised favors or something of value by the prosecution. *See, e.g.*, Trial Tr. vol. 42: 182, 259-60.

In addition, the testimony of the various inmates was internally inconsistent. Indeed, the testimony was so noticeably inconsistent that the State made excuses for it in closing argument. Trial Tr. vol. 46: 15 ("And in this case we knew before

we brought you these inmates that the peripheral things, which way did he arrive, what kind of clothing was he wearing, did he keep his shirt on or not, we knew that was going to be a jumble.").

In contrast to the favorable treatment shown to the inmates who testified for the State, the inmates who testified on behalf of Mr. Pruett – rather than receiving favorable treatment – were threatened by correctional officers. Trial Tr. vol. 44: 92. For example, fear of retaliation from correctional officers kept James Richard from telling investigators that he knew that Pruett had cut his hand before Nagle died instead of – as the State alleged at trial – in the act of killing Nagle. Clerk's R. vol. 1: 65-66.

Both sides rested on April 19, 2002. Trial Tr. vol. 45: 232. The jury began deliberating immediately after lunch on Monday, April 22, 2002. Trial Tr. vol. 46: 79-80. The fact that the jury considered the state's case weak is evident from the fact that jurors spent an entire day deliberating guilt/innocence. The jury deliberated until after lunch the following day. Trial Tr. vol. 47: 16-17. Pruett was found guilty on April 23 and was sentenced to death on April 30. Trial Tr. vol. 47: 17; 51: 57.

### D. Chapter 64 proceedings

On May 9, 2013, Pruett filed a Motion for Post-Conviction DNA and Palm Print Testing. Clerk's R. vol. 1: 2. Believing the presence of a palm print on the

report indicated there were likely sufficient epithelial cells on the report that a DNA profile could be developed through processes unavailable at the time of his trial, Pruett asked the trial court to order that the pieces of the disciplinary report be tested. Clerk's R. vol. 1: 14. Pruett further requested that the palm print on the report be compared to the palm print database maintained by the Department of Public Safety (DPS). Clerk's R. vol. 1: 15.

On June 6, DPS reported that it was unable to match the palm print on the report with any of the prints maintained in its database. *Id.* at 42. The State then sent the evidence to the University of North Texas Center for Human Identification (UNTCHI) for collection and analysis of DNA. UNTCHI subsequently issued a report (on July 9, 2013) indicating that its testing had been inconclusive.

After the trial court ordered the lab to provide Pruett's habeas counsel with a copy of the case file generated during testing, counsel observed what appeared to be markers at several loci. However, UNTCHI had made no attempt to determine whether Pruett and Nagle could be excluded as being contributors to the sample, despite the court order to do so. Clerk's R. vol. 1: 36, 81.

Habeas counsel subsequently filed a motion asking the court to appoint Charity Holland of Mitotyping Technologies to assist counsel in preparing for the hearing that had been set for November 18. *Id.* at 47-56. On November 18, 2013, the Court appointed Ms. Holland to assist counsel.

Ms. Holland's review revealed that of the several loci at which counsel had observed markers while reviewing UNTCHI's file, markers were only present in an amount above the analytical threshold at one locus. Rep.'s R. vol. 2: 3.[6] The 12 allele was identified as being present at the D13 locus. *Id.* While the UNTCHI's conclusion that the results were inconclusive was correct because it would be inappropriate to report a match with a known person based on such an incomplete profile, it was possible to determine whether individuals could be excluded as being the source of the DNA. Because the DNA profiles of both Nagle and Pruett contain the 12 allele at the D13 locus, *id.*, neither could be eliminated as being a possible source of the DNA left on the disciplinary report. This 12 allele is present at the D13 locus in the DNA profiles of "approximately 20% of the Asian and Hispanic populations, 30% of the Caucasian population, and 40% of the African American population." Rep.'s R. vol. 2: 4. In other words, approximately one-third of the population at the McConnell Unit could not be excluded as contributing the DNA still present on the report.

The trial court concluded, in view of the inconclusive DNA results, that the evidence was not exculpatory, and this Court affirmed. According to the Court, "inconclusive results do not establish a reasonable probability of anything." *Pruett*

---

[6] Citations to the Reporter's record are to the record in the appeal pursuant to chapter 64 in this Court, Pruett v. State, No. AP-77,037, and are abbreviated as Rep.'s R. vol. [number]: [page number].

14

*v. State*, No. AP-77,037, 2014 WL 5422573, at *2 (Tex. Crim. App. Oct. 22, 2014).

## ARGUMENT AND AUTHORITY

In 2001, the State of Texas gave death-sentenced individuals the right to have potentially exculpatory biological evidence tested. Tex. Code Crim. Proc. ch. 64 (attached as Exhibit E). In addition, a different provision of Texas law mandates that, in cases where a defendant is convicted of a capital felony, all biological evidence collected during the State's investigation be preserved "until the inmate is executed, dies, or is released on parole…." Tex. Code Crim. Proc. art. 38.43(c)(2)(A) (attached as Exhibit F). The Texas Department of Public Safety has issued a handbook that explains what is required for biological evidence to be properly preserved.

In this case, the State collected and possessed evidence that could have conclusively established Mr. Pruett's innocence, and aided in the identification of the actual perpetrator(s). But by engaging in lengthy delay before testing the evidence, and by storing it in a grossly negligent manner, the State has deprived Mr. Pruett of the possibility of proving his innocence. It now threatens him with imminent execution when his inability to establish his innocence is due to the State's very conduct.

**I.** **State statutes and guidelines mandated that the physical evidence be preserved properly until Mr. Pruett was either executed, died, or was released on parole.**

The Texas Code of Criminal Procedure defines "biological material" as "an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail clippings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing." Tex. Code Crim. Proc. art. 64.01(1). The apparently synonymous term "biological evidence" is defined similarly in the preservation statute. Tex. Code Crim. Proc. art. 38.43(2). Because they were collected by the State in the course of investigating Officer Nagle's murder, and because they contain skin tissue and blood and might reasonably (had they been properly preserved) be used to either identify the person that murdered Officer Nagle or exclude a person from the group of persons that could have murdered Officer Nagle, the torn pieces of the disciplinary report satisfy the statutory definitions of "biological material" and "biological evidence." Consequently, the material Mr. Pruett sought to test – the material that could have demonstrated his innocence – was required by state law to have been collected and preserved.

Various arms of the State were involved in the collection, storage, and analysis of the evidence; all of them are subject to the requirements of article 38.43 – that is, the statute's obligations apply to the investigators that collected the

16

evidence, the DPS crime lab analysts, the SPU, and (presumably) the Bee County Clerk's office, *see supra* note 4. Tex. Code Crim. Proc. art. 38.43(b). Accordingly, each of these entities was charged with properly preserving the pieces of the disciplinary report until Mr. Pruett was executed, died, or was released on parole. *Id.* art. 38.43(c)(2)(A).

The DPS published a document detailing the best practices for collecting, packaging, storing, preserving, and retrieving biological evidence (attached as Exhibit G). The section pertaining to "biological evidence" uses the definition of that term found in article 38.43 and clearly anticipates items such as the torn pieces of paper. Exhibit G at A-028, A-029 (listing paper towels and handled items as potential sources of biological material). The handbook makes clear that when packaging biological evidence, it is necessary to "avoid the use of plastic packaging as an inner or outer package." Exhibit G at A-030. The Physical Evidence Handbook, also published by DPS (excerpt attached as Exhibit H), emphasizes the point: "Do not use plastic packaging for biological evidence." Exhibit H at A-038. It is vital that biological evidence not be stored in plastic bags because "they provide a growth medium for bacteria that may degrade DNA evidence." *DNA Evidence: What Law Enforcement Officers Should Know*, NIJ Journal, July 2003, at 10, 13, *available at* https://www.ncjrs.gov/pdffiles1/jr000249c.pdf; *see also* U.S. Dep't of Commerce

Technical Working Group on Biological Evidence Preservation, The Biological Evidence Preservation Handbook: Best Practices for Evidence Handlers 16 (2013), *available at* http://www.crime-scene-investigator.net/BiologicalEvidence PreservationHandbook.pdf.

As Exhibit D demonstrates, the pieces of paper were stored in plastic bags – against the recommendations of the DPS – from at least February 24, 2000 until at least July 1, 2013. It is impossible to know whether the torn pieces of the report contained sufficient epithelial cells to produce a complete profile when they were initially collected by Officer Chris King on December 17, 1999. What is known, though, is that DNA was not present in a sufficient amount when it was analyzed in July 2013 after being stored in a plastic bag for thirteen years. What is also known is that the entities that had a duty to preserve the evidence failed to preserve it in a way that would best preserve it.

Evidence such as the torn pieces of the disciplinary report are best preserved in a temperature controlled environment in which temperature is maintained between sixty and seventy-five degrees Fahrenheit with less than sixty percent humidity. Biological Evidence Preservation Handbook, *supra*, at 17-18. While counsel cannot be certain of the environment in which the evidence was stored (presumably the Bee County Clerk's office), it is unlikely that an effort was made to control the environment as needed to best preserve the evidence.

18

**II. Mr. Pruett had a state-created right to have the evidence tested. Fundamental fairness as well as state statutory law required the evidence be properly preserved. Because it was not, his execution would violate the Eighth and the Fourteenth Amendments.**

Pursuant to article 64.03 of the Code of Criminal Procedure, if a death-sentenced man, such as Mr. Pruett, presents a motion that requests to have biological material tested that still exists in a condition that makes testing possible and could yield exculpatory results, he is entitled to have the evidence tested. Tex. Code Crim. Proc. art. 64.03. While absent the state-created right, Mr. Pruett did not have a right to have the evidence tested, because the state gave him that right, it must also ensure that the processes it employs as he avails himself of the right due not violate fundamental fairness. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009).

In Mr. Pruett's case, however, the State – by failing to properly preserve the evidence he was entitled to have tested – has violated the principles of fundamental fairness. Even if the Eighth Amendment does not create a right that permits an inmate to establish his innocence in post-conviction proceedings, both Congress in enacting AEDPA and the State of Texas in enacting Chapter 64 have demonstrated the offensiveness of carrying out the execution of someone who is actually innocent. Before either AEDPA or Chapter 64 were enacted, this Court recognized that the "execution of an innocent person would violate the Due Process Clause of

19

the Fourteenth Amendment." *Ex parte Elizondo*, 947 S.W.2d 202, 204 (Tex Crim. App. 1996) (*citing State ex. rel. Holmes v. Court of Appeals*, 885 S.W.2d 389, 397 (Tex. Crim. App. 1994)). In Mr. Pruett's case, however, the State purported to allow him (and others like him) to prove their innocence, but then made the demonstration impossible by negligently handling the evidence. Both the Due Process Clause and the Eighth Amendment's concern with reliable determinations of guilt will be offended by permitting the execution of Mr. Pruett to go forward.

## III.     Mr. Pruett is clearly entitled to the relief sought and has no other remedy at law.

Extraordinary relief – such as a writ of prohibition – is available only where the Relator is clearly entitled to relief and where there is no other adequate remedy to protect Relator's rights or interests. *Curry v. Wilson*, 853 S.W.2d 40, 43 (Tex. Crim. App. 1993). Because Pruett "has no right to present his Eighth Amendment claim by way of appeal or habeas corpus application under Article 11.071," the Court should find he has no adequate remedy at law. *Chi*, 256 S.W.3d at 702.

The Court should similarly find Pruett is entitled to the relief sought. Prior to Pruett's trial, the legislature enacted a means by which defendants are allowed to attempt to establish they are innocent of the crimes they were committed. To allow the State to circumvent the intent of the legislature by failing to properly preserve evidence would be an injustice. This is particularly true in the case of death-

20

sentenced inmates, such as Pruett. This is not a case where the evidence in question was tangential and of the sort that the State had no reason to believe it necessary to properly preserve. The evidence at issue – the torn pieces of the disciplinary report – was the State's case.

## PRAYER FOR RELIEF

Accordingly, Relator Pruett respectfully requests that this Court issue and order prohibiting the Director from carrying out Pruett's execution on April 28, 2015 because his execution would be in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Respectfully Submitted,


s/ David R. Dow

_____
David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
100 Law Center
Houston, Texas 77204-6060
Tel. (713) 743-2171
Fax (713) 743-2131

*Counsel for Robert Pruett*

21

**CERTIFICATION PURSUANT TO TRAP 52.3(j)**

I certify that I have reviewed this petition and have concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

s/ David R. Dow

_____

David R. Dow

**CERTIFICATE OF SERVICE**

I certify that on the 26th day of March 2015, a true and correct copy of the above legal document was delivered via email to:

Jefferson Clendenin
Assistant Attorney General
Criminal Appeals Division
Texas Bar No. 24059589
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel. (512) 936-1600
Fax (512) 320-8132
Email jay.clendenin@texasattorneygeneral.gov

s/ David R. Dow

_____

David R. Dow

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface using MS Word in Times New Roman 14-point font for body text and 12-point font for footnote text. The petition contains 3,552 words, excluding the parts exempted by Tex. R. App. P. 9.4(i)(1)

s/ David R. Dow

_____

David R. Dow

# Exhibit A

## CAUSE NO. B-01-M015-0-PR-B

| THE STATE OF TEXAS | § | IN THE 156TH DISTRICT |
|---|---|---|
| VS. | § § § | COURT OF |
| ROBERT LYNN PRUETT | § § | BEE COUNTY, TEXAS |

## CORRECTED THIRD ORDER SETTING EXECUTION

The Texas Court of Criminal Appeals having affirmed the prisoner's conviction, the United States Supreme Court having denied certiorari review, and mandate having issued, the prisoner's conviction is now final. See *Pruett V. State*, No. 74,370, 2004 WL 3093232 (Tex. Crim. App. September 22, 2004). The prisoner's original application for habeas corpus relief has been denied by the Court of Criminal Appeals, *Ex parte Pruett*, 207 S.W.3d 767 (Tex.Crim.App.2005); and similar relief has been denied by the District Court for the Southern District of Texas, *Pruett v. Thaler*, No. C-06-CA-465-H (S.D. Tex. August 12, 2010); *certificate of appealability denied*, case NO. 10-70,024 (5th Cir.2011, opinion not published); *cert. denied*, No. 11,10297 (2012). FURTHERMORE, post-conviction DNA analysis and post-conviction palm print comparison has been concluded. The post-conviction DNA analysis results were inconclusive. The post-conviction palm print search was performed with negative results. Also, the Texas Court of Criminal Appeals, on December 10, 2014, in No. WR-62,099-02, dismissed the prisoner's most recent application for writ of habeas corpus as an abuse of the writ. Therefore, pursuant to TEX. CODE CRIM. PROC. Art. 43.414(a)(1) and 43.141(c), this Court now enters the following order:

IT IS ORDERED that the prisoner, **ROBERT LYNN PRUETT**, who has been adjudged guilty of Capital Murder as charged in the indictment and whose punishment has been assessed by the verdict of the jury and the judgment of the Court as death, shall be kept in custody by the

Director of the Institutional Division of Texas Department of Criminal Justice at Huntsville, Texas, until Tuesday, the 28th of April, 2015, upon which day, at the Institutional Division of the Texas Department of Criminal Justice at Huntsville, Texas, at any time after 6:00 p.m., in a room arranged for the purpose of execution, the Director, acting as provided by law, is commanded to carry out this sentence of death by intravenous injection of a substance or substances in a lethal quantity sufficient to cause the death of **ROBERT LYNN PRUETT** and until **ROBERT LYNN PRUETT** is dead, such procedure to be determined and supervised by the Director of the Institutional Division of the Texas Department of Criminal Justice.

The clerk of this Court shall, within ten days after the Court enters this Order Setting Execution, issue and deliver to the Sheriff of Bee County, Texas, a certified copy of this Order along with a Death Warrant in accordance with TEX. CODE CRIM. PROC. art. 43.15. The Death Warrant shall recite (1) the fact of conviction, (2) set forth the specific offense, (3) the judgment of the Court, and (4) the time fixed for execution. The Death Warrant shall be directed to the Director of the Institutional Division of the Texas Department of Criminal Justice at Huntsville, Texas, and command the Director to proceed to put into execution the judgment of death against **ROBERT LYNN PRUETTT**.

The Sheriff of Bee County, Texas is ordered, upon receipt of the Death Warrant, to deliver the Death Warrant and a certified copy of this Order to the Director of the Institutional Division of Criminal Justice, Huntsville, Texas.

SIGNED AND ENTERED THIS _17_ day of _December, 2014_.

JUDGE PRESIDING
156th District Court
Bee County, Texas

Corrected Third Order Setting Execution – Page 2 of 2

A-003

# Exhibit B

| United States Code Annotated |
| Constitution of the United States |
| Annotated |
| Amendment XIV. Citizenship; Privileges and Immunities; Due Process; Equal Protection; |
| Apportionment of Representation; Disqualification of Officers; Public Debt; Enforcement |

U.S.C.A. Const. Amend. XIV-Full Text

AMENDMENTXIV. CITIZENSHIP; PRIVILEGES AND IMMUNITIES; DUE
PROCESS; EQUAL PROTECTION; APPOINTMENT OF REPRESENTATION;
DISQUALIFICATION OF OFFICERS; PUBLIC DEBT; ENFORCEMENT

Currentness

**Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**Section 2.** Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

**Section 3.** No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

**Section 4.** The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any State shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

**Section 5.** The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

United States Code Annotated
  Constitution of the United States
    Annotated
      Amendment VIII. Excessive Bail, Fines, Punishments

U.S.C.A. Const. Amend. VIII

Amendment VIII. Excessive Bail, Fines, Punishments

Currentness

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit D





A57-3-13



A-011



A-012

4-31



# Exhibit E

CODE OF CRIMINAL PROCEDURE

TITLE 1. CODE OF CRIMINAL PROCEDURE

CHAPTER 64. MOTION FOR FORENSIC DNA TESTING

Art. 64.01. MOTION.  (a)  In this section, "biological material":

(1)  means an item that is in possession of the state and that contains blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing; and

(2)  includes the contents of a sexual assault evidence collection kit.

(a-1)  A convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material.  The motion must be accompanied by an affidavit, sworn to by the convicted person, containing statements of fact in support of the motion.

(b)  The motion may request forensic DNA testing only of evidence described by Subsection (a-1) that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the offense, but:

(1)  was not previously subjected to DNA testing; or

(2)  although previously subjected to DNA testing, can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test.

(c)  A convicted person is entitled to counsel during a proceeding under this chapter.  The convicting court shall appoint counsel for the convicted person if the person informs the court that the person wishes to submit a motion under this chapter, the court finds reasonable grounds for a motion to be filed, and the court determines that the person is indigent.  Counsel must be appointed under this subsection not later than the 45th day after the date the court finds reasonable grounds or the date the court determines that the person is indigent, whichever is

later.   Compensation of counsel is provided in the same manner as is required by:

      (1)   Article 11.071 for the representation of a petitioner convicted of a capital felony; and

      (2)   Chapter 26 for the representation in a habeas corpus hearing of an indigent defendant convicted of a felony other than a capital felony.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 2, eff. April 5, 2001. Subsec. (c) amended by Acts 2003, 78th Leg., ch. 13, Sec. 1, eff. Sept. 1, 2003.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 1006 (H.B. 681), Sec. 2, eff. September 1, 2007.
    Acts 2011, 82nd Leg., R.S., Ch. 278 (H.B. 1573), Sec. 5, eff. September 1, 2011.
    Acts 2011, 82nd Leg., R.S., Ch. 366 (S.B. 122), Sec. 1, eff. September 1, 2011.


    Art. 64.011. GUARDIANS AND OTHER REPRESENTATIVES.  (a)  In this chapter, "guardian of a convicted person" means a person who is the legal guardian of the convicted person, whether the legal relationship between the guardian and convicted person exists because of the age of the convicted person or because of the physical or mental incompetency of the convicted person.

    (b) A guardian of a convicted person may submit motions for the convicted person under this chapter and is entitled to counsel otherwise provided to a convicted person under this chapter.

Added by Acts 2003, 78th Leg., ch. 13, Sec. 2, eff. Sept. 1, 2003.


    Art. 64.02.  NOTICE TO STATE; RESPONSE.  (a)  On receipt of the motion, the convicting court shall:

      (1)   provide the attorney representing the state with a copy of the motion; and

A-016

(2)  require the attorney representing the state to take one of the following actions in response to the motion not later than the 60th day after the date the motion is served on the attorney representing the state:

(A)  deliver the evidence to the court, along with a description of the condition of the evidence; or

(B)  explain in writing to the court why the state cannot deliver the evidence to the court.

(b)  The convicting court may proceed under Article 64.03 after the response period described by Subsection (a)(2) has expired, regardless of whether the attorney representing the state submitted a response under that subsection.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 2, eff. April 5, 2001. Amended by:

Acts 2007, 80th Leg., R.S., Ch. 1006 (H.B. 681), Sec. 3, eff. September 1, 2007.


Art. 64.03. REQUIREMENTS;  TESTING.  (a)  A convicting court may order forensic DNA testing under this chapter only if:

(1) the court finds that:

(A) the evidence:

(i) still exists and is in a condition making DNA testing possible;  and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;  and

(B) identity was or is an issue in the case;  and

(2) the convicted person establishes by a preponderance of the evidence that:

(A) the person would not have been convicted if exculpatory results had been obtained through DNA testing;  and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

A-017

(b)   A convicted person who pleaded guilty or nolo contendere or, whether before or after conviction, made a confession or similar admission in the case may submit a motion under this chapter, and the convicting court is prohibited from finding that identity was not an issue in the case solely on the basis of that plea, confession, or admission, as applicable.

(c)   If the convicting court finds in the affirmative the issues listed in Subsection (a)(1) and the convicted person meets the requirements of Subsection (a)(2), the court shall order that the requested forensic DNA testing be conducted.  The court may order the test to be conducted by:

(1)   the Department of Public Safety;

(2)   a laboratory operating under a contract with the department; or

(3)   on the request of the convicted person, another laboratory if that laboratory is accredited under Section 411.0205, Government Code.

(d)   If the convicting court orders that the forensic DNA testing be conducted by a laboratory other than a Department of Public Safety laboratory or a laboratory under contract with the department, the State of Texas is not liable for the cost of testing under this subsection unless good cause for payment of that cost has been shown.  A political subdivision of the state is not liable for the cost of testing under this subsection, regardless of whether good cause for payment of that cost has been shown.  If the court orders that the testing be conducted by a laboratory described by this subsection, the court shall include in the order requirements that:

(1)   the DNA testing be conducted in a timely and efficient manner under reasonable conditions designed to protect the integrity of the evidence and the testing process;

(2)   the DNA testing employ a scientific method sufficiently reliable and relevant to be admissible under Rule 702, Texas Rules of Evidence;  and

(3)   on completion of the DNA testing, the results of the testing and all data related to the testing required for an evaluation of the test results be immediately filed with the court and copies of the

results and data be served on the convicted person and the attorney representing the state.

     (e) The convicting court, not later than the 30th day after the conclusion of a proceeding under this chapter, shall forward the results to the Department of Public Safety.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 2, eff. April 5, 2001. Subsec. (a) amended by Acts 2003, 78th Leg., ch. 13, Sec. 3, eff. Sept. 1, 2003.
Amended by:
     Acts 2007, 80th Leg., R.S., Ch. 1006 (H.B. 681), Sec. 4, eff. September 1, 2007.


     Art. 64.035.  UNIDENTIFIED DNA PROFILES.  If an analyzed sample meets the applicable requirements of state or federal submission policies, on completion of the testing under Article 64.03, the convicting court shall order any unidentified DNA profile to be compared with the DNA profiles in:
          (1)  the DNA database established by the Federal Bureau of Investigation; and
          (2)  the DNA database maintained by the Department of Public Safety under Subchapter G, Chapter 411, Government Code.

Added by Acts 2011, 82nd Leg., R.S., Ch. 278 (H.B. 1573), Sec. 6, eff. September 1, 2011.
Added by Acts 2011, 82nd Leg., R.S., Ch. 366 (S.B. 122), Sec. 2, eff. September 1, 2011.


     Art. 64.04.  FINDING.  After examining the results of testing under Article 64.03 and any comparison of a DNA profile under Article 64.035, the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 2, eff. April 5, 2001.
Amended by Acts 2003, 78th Leg., ch. 13, Sec. 4, eff. Sept. 1, 2003.

A-019

Amended by:

     Acts 2011, 82nd Leg., R.S., Ch. 278 (H.B. 1573), Sec. 7, eff. September 1, 2011.

     Acts 2011, 82nd Leg., R.S., Ch. 366 (S.B. 122), Sec. 3, eff. September 1, 2011.


     Art. 64.05. APPEALS.  An appeal under this chapter is to a court of appeals in the same manner as an appeal of any other criminal matter, except that if the convicted person was convicted in a capital case and was sentenced to death, the appeal is a direct appeal to the court of criminal appeals.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 2, eff. April 5, 2001.
Amended by Acts 2003, 78th Leg., ch. 13, Sec. 5, eff. Sept. 1, 2003.

A-020

# Exhibit F

Added by Acts 2003, 78th Leg., ch. 923, Sec. 1, eff. Sept. 1, 2003. Amended by:

     Acts 2013, 83rd Leg., R.S., Ch. 78 (S.B. 354), Sec. 5, eff. May 18, 2013.


     Art. 38.43.  EVIDENCE CONTAINING BIOLOGICAL MATERIAL.  (a)  In this article, "biological evidence" means:

          (1)  the contents of a sexual assault examination kit; or

          (2)  any item that contains blood, semen, hair, saliva, skin tissue, fingernail scrapings, bone, bodily fluids, or any other identifiable biological material that was collected as part of an investigation of an alleged felony offense or conduct constituting a felony offense that might reasonably be used to:

               (A)  establish the identity of the person committing the offense or engaging in the conduct constituting the offense; or

               (B)  exclude a person from the group of persons who could have committed the offense or engaged in the conduct constituting the offense.

     (b)  This article applies to a governmental or public entity or an individual, including a law enforcement agency, prosecutor's office, court, public hospital, or crime laboratory, that is charged with the collection, storage, preservation, analysis, or retrieval of biological evidence.

     (c)  An entity or individual described by Subsection (b) shall ensure that biological evidence collected pursuant to an investigation or prosecution of a felony offense or conduct constituting a felony offense is retained and preserved:

          (1)  for not less than 40 years, or until the applicable statute of limitations has expired, if there is an unapprehended actor associated with the offense; or

          (2)  in a case in which a defendant has been convicted, placed on deferred adjudication community supervision, or adjudicated as having engaged in delinquent conduct and there are no additional unapprehended actors associated with the offense:

A-022

(A)  until the inmate is executed, dies, or is released on parole, if the defendant is convicted of a capital felony;

(B)  until the defendant dies, completes the defendant's sentence, or is released on parole or mandatory supervision, if the defendant is sentenced to a term of confinement or imprisonment in the Texas Department of Criminal Justice;

(C)  until the defendant completes the defendant's term of community supervision, including deferred adjudication community supervision, if the defendant is placed on community supervision;

(D)  until the defendant dies, completes the defendant's sentence, or is released on parole, mandatory supervision, or juvenile probation, if the defendant is committed to the Texas Youth Commission; or

(E)  until the defendant completes the defendant's term of juvenile probation, including a term of community supervision upon transfer of supervision to a criminal court, if the defendant is placed on juvenile probation.

(d)  The attorney representing the state, clerk, or other officer in possession of biological evidence described by Subsection (a) may destroy the evidence, but only if the attorney, clerk, or officer by mail notifies the defendant, the last attorney of record for the defendant, and the convicting court of the decision to destroy the evidence and a written objection is not received by the attorney, clerk, or officer from the defendant, attorney of record, or court before the 91st day after the later of the following dates:

(1)  the date on which the attorney representing the state, clerk, or other officer receives proof that the defendant received notice of the planned destruction of evidence; or

(2)  the date on which notice of the planned destruction of evidence is mailed to the last attorney of record for the defendant.

(e)  To the extent of any conflict, this article controls over Article 2.21.

(f)  The Department of Public Safety shall adopt standards and rules authorizing a county with a population less than 100,000 to ensure the preservation of biological evidence by promptly delivering the evidence

to the Department of Public Safety for storage in accordance with Section 411.053, Government Code, and department rules.

(g)  The Department of Public Safety shall adopt standards and rules, consistent with best practices, relating to a person described by Subsection (b), that specify the manner of collection, storage, preservation, and retrieval of biological evidence.

(h)  A person described by Subsection (b) may solicit and accept gifts, grants, donations, and contributions to support the collection, storage, preservation, retrieval, and destruction of biological evidence.

(i)  Before a defendant is tried for a capital offense in which the state is seeking the death penalty, subject to Subsection (j), the state shall require either the Department of Public Safety through one of its laboratories or a laboratory accredited under Section 411.0205, Government Code, to perform DNA testing, in accordance with the laboratory's capabilities at the time the testing is performed, on any biological evidence that was collected as part of an investigation of the offense and is in the possession of the state.  The laboratory that performs the DNA testing shall pay for all DNA testing performed in accordance with this subsection.

(j)  As soon as practicable after the defendant is charged with a capital offense, or on a motion by the state or the defendant in a capital case, unless the state has affirmatively waived the death penalty in writing, the court shall order the state and the defendant to meet and confer about which biological materials collected as part of an investigation of the offense qualify as biological evidence that is required to be tested under Subsection (i).  If the state and the defendant agree on which biological materials constitute biological evidence, the biological evidence shall be tested in accordance with Subsection (i).  If the state and the defendant do not agree on which biological materials qualify as biological evidence, the state or the defendant may request the court to hold a hearing to determine the issue. On receipt of a request for a hearing under this subsection, the court shall set a date for the hearing and provide written notice of the hearing date to the state and the defendant.  At the hearing, there is a rebuttable presumption that the biological material that the defendant

requests to be tested constitutes biological evidence that is required to be tested under Subsection (i).  This subsection does not in any way prohibit the state from testing biological evidence in the state's possession.

(k)  If an item of biological evidence is destroyed or lost as a result of DNA testing performed under Subsection (i), the laboratory that tested the evidence must provide to the defendant any bench notes prepared by the laboratory that are related to the testing of the evidence and the results of that testing.

(l)  The defendant's exclusive remedy for testing that was not performed as required under Subsection (i) or (j) is to seek a writ of mandamus from the court of criminal appeals at any time on or before the date an application for a writ of habeas corpus is due to be filed in the defendant's case under Section 4(a), Article 11.071.  An application for a writ of mandamus under this subsection does not toll any period of limitations applicable to a habeas petition under state or federal law.  The defendant is entitled to only one application for a writ of mandamus under this subsection.  At any time after the date an application for a writ of habeas corpus is filed in the defendant's case under Section 4(a), Article 11.071, the defendant may file one additional motion for forensic testing under Chapter 64.

(m)  A defendant may have another laboratory accredited under Section 411.0205, Government Code, perform additional testing of any biological evidence required to be tested under Subsection (i).  On an ex parte showing of good cause to the court, a defendant may have a laboratory accredited under Section 411.0205, Government Code, perform testing of any biological material that is not required to be tested under Subsection (i).  The defendant is responsible for the cost of any testing performed under this subsection.

Added by Acts 2001, 77th Leg., ch. 2, Sec. 1, eff. April 5, 2001. Renumbered from Code of Criminal Procedure, Art/Sec 38.39 by Acts 2005, 79th Leg., Ch. 728 (H.B. 2018), Sec. 23.001(8), eff. September 1, 2005. Amended by:
     Acts 2009, 81st Leg., R.S., Ch. 1179 (H.B. 3594), Sec. 1, eff. September 1, 2009.

A-025

Acts 2011, 82nd Leg., R.S., Ch. 91 (S.B. 1303), Sec. 27.002(1), eff. September 1, 2011.

Acts 2011, 82nd Leg., R.S., Ch. 1248 (S.B. 1616), Sec. 1, eff. June 17, 2011.

Acts 2013, 83rd Leg., R.S., Ch. 1349 (S.B. 1292), Sec. 1, eff. September 1, 2013.


Art. 38.44.  ADMISSIBILITY OF ELECTRONICALLY PRESERVED DOCUMENT.  An electronically preserved document has the same legal significance and admissibility as if the document had been maintained in hard-copy form.  If a party opposes admission of the document on the grounds that the document has been materially altered, the proponent of the document must disprove the allegation by a preponderance of the evidence.

Added by Acts 2005, 79th Leg., Ch. 312 (S.B. 611), Sec. 5, eff. June 17, 2005.


Art. 38.45.  EVIDENCE DEPICTING OR DESCRIBING ABUSE OF OR SEXUAL CONDUCT BY CHILD OR MINOR.  (a)  During the course of a criminal hearing or proceeding, the court may not make available or allow to be made available for copying or dissemination to the public property or material:

(1)  that constitutes child pornography, as described by Section 43.26(a)(1), Penal Code;

(2)  the promotion or possession of which is prohibited under Section 43.261, Penal Code; or

(3)  that is described by Section 2 or 5, Article 38.071, of this code.

(b)  The court shall place property or material described by Subsection (a) under seal of the court on conclusion of the criminal hearing or proceeding.

(c)  The attorney representing the state shall be provided access to property or material described by Subsection (a).  In the manner provided by Article 39.15, the defendant, the defendant's attorney, and any individual the defendant seeks to qualify to provide expert testimony at

# Exhibit G



# BEST PRACTICES FOR COLLECTION, PACKAGING, STORAGE, PRESERVATION, AND RETRIEVAL OF BIOLOGICAL EVIDENCE

## Definitions of Biological Evidence and Biological Material

"Biological evidence" is defined in Art. 38.43 Code of Criminal Procedure, as follows:

1. *The contents of a sexual assault examination kit; or*

2. *Any item that contains blood, semen, hair, saliva, skin tissue, fingernail scrapings, bone, bodily fluids, or any other identifiable biological material that was collected as part of an investigation of an alleged felony offense or conduct constituting a felony offense that might reasonably be used to:*

   a) *Establish the identity of the person committing the offense or engaging in the conduct constituting the offense; or*

   b) *Exclude a person from the group of persons who could have committed the offense or engaged in the conduct constituting the offense.*

## Items to Consider as Sources of Biological Evidence or Materials for the Purpose of this Statute

The following list is meant only as a general guide for use in the investigation of crimes in which biological evidence and materials may have evidentiary value. These are:

- Sexual assault examination kits, both victim and suspect kits

- Slides, swabs, test tubes or the proximate container for each from sexual assault examination kits and autopsies

- Clothing, hats, masks, eyeglasses, jewelry, gloves from any involved individuals

- Ligatures such as rope, belts, tape and cords

- Bedding such as sheets, blankets, comforters, pillow cases, pillows and mattress pads

- Other household materials such as towels, used tissues, toilet paper and paper towels

- Condoms

- Drinking containers such as cups, cans and bottles

- Cigarette butts or other smoking devices

- Handled items such as weapons and tools

- Licked items such as envelopes and stamps

- Samples of items retained by a coroner for forensic or toxicology laboratory testing

- Biological reference standards from known individuals such as buccal swabs from a victim, suspect, consensual sex partner or elimination standards

- Secondary reference standards from missing persons such as a toothbrush or hair brush

The above list is not exhaustive. There are many other possible sources of biological evidence or materials.


Training on these and other topics can provide further insight as to the item types and locations of possible biological material.

**Items Which Should Not Be Considered As Biological Evidence for the Purpose of this Statute**

- Sample of whole blood from a DWI suspect

## Evidence Collection

Biological evidence and materials should be collected in a manner that prevents contamination and degradation and ensures integrity during all phases of the investigation and litigation. To avoid contamination, sample collection tools and materials must be free from human DNA. Disposable latex examination gloves, individually wrapped swabs or other individually wrapped items are free of human DNA by virtue of the process of manufacture.

Not all germicidal treatments destroy DNA. Alcohol and hydrogen peroxide, for instance, do not destroy DNA. The most effective way to clean collection equipment is to wipe it with a fresh 10% bleach solution of 10:1 water to bleach. (Any commercially available bleach is adequate for this purpose.)

**Clean Collection Practices**

Here are examples of ways to prevent contamination and degradation of biological evidence:

1. Use disposable latex (or similar) gloves to handle evidence rather than reusable uniform/tactical gloves. Do not touch the outside of gloves to face or hands, or use personal items such as cell phones or radios and change gloves after contact with potential biological evidence.

2. When field testing evidence, swab the stain and test the swab rather than directly testing the stain. If the stain is small, it should be tested in a lab rather than in the field.

3. Fingerprint powder and brushes carry biological material from one item to the next. Collect DNA samples before powdering or use single use brushes and sterile powder.

4. Clean tools between samples. For example, dip forceps in a fresh 10% bleach solution of 10:1 water to bleach and thoroughly dry prior to reuse.

5. When it is necessary to dampen a swab to collect a dried stain, any source of water that does not contain human DNA is acceptable. Sterile water, distilled water, saline solution and tap water meet this definition. Document which type of water is used.

6. Dry damp items and swabs. When it is not possible to thoroughly dry the item, packaging such as paper bags will allow the drying process to continue.

7. Wet items may be dried by hanging or by laying out on a clean surface indoors away from the scene.

8. Package each item separately.

9. The use of personal protective equipment (disposable clothing, gloves, masks, etc.) both protects the individual from biohazard exposure and prevents transfer of the investigator's DNA to the evidence.


To implement these provisions, these tools are useful:

- Latex or similar gloves
- Sterile swabs
- Water
- Paper containers such as bags, envelopes, boxes
- Tamper Evident Tape
- Permanent marker

## Packaging

These are best practices to keep in mind when packaging biological evidence at a crime scene:

- Package evidence and seal the container to protect it from loss, cross transfer, contamination and/or deleterious change.

- Seal the package in such a manner that opening it causes obvious damage or alteration to the container or its seal.

- Package evidence for safety by using boxes or breathable tubes for sharp items, marking items and informing the laboratory if a biohazard is present.

- Package unloaded firearms in clean, unused boxes when submitting them for biological analysis. Mark the packaging and inform the laboratory if a biohazard is present.

- Use paper bags, envelopes, boxes and similar materials for all biological evidence.

- Avoid plastic packaging as an inner or outer package.

- Avoid the use of pill tins due to possible rust.

- Ensure that all swabs and evidence are dry.

- Package each item separately; avoid commingling items to prevent cross contamination.

- Swabs collected from a single item may be packaged in the same container.

- Mark each package with a detailed description that includes the item, location where it was collected, name of the person who collected it and date of collection.

- Seal each package with tape. (staples are not considered a proper seal.) All seals must be marked to identify the person making the seal. Mark through the seal with name or initials and date.

- The integrity of the item often is maintained through the package's documentation. That documentation includes all markings, seals, tags and labels used by all of the involved agencies. Therefore, it is critical to preserve or document all packaging and labels received by or returned to your agency.

**Note**: If an item (such as a used condom or fetus/product of conception) cannot be dried, it may be placed in plastic and frozen. The laboratory should be contacted as soon as possible for further guidance.

## Document Evidence

During the collection process, it is essential to record the location of evidence collected at a crime scene. These are effective methods to do this:

- Use photographs and placards to document the location of each item.

- Develop detailed documentation that describes the item, location where it was collected, name of the person who collected it and date of collection.

- Make a sketch of the scene that includes distances and a legend.

## Contamination Prevention

To limit the potential for outside contamination of evidence prior to and during the collection process:

- Secure and limit the scene to essential personnel.

- Change disposable gloves if there is contact with biological material.

- Avoid glove-to-skin contact that can occur by rubbing eyes or nose or wiping perspiration.

- Avoid talking, coughing, sneezing, perspiring on or over evidence.

- Avoid walking on or over evidence.

- Avoid hair loss at scene from head, arms or face.

- Leave the scene if you become injured. Do not return until any blood loss has been stopped and clothing is clean.

- Do not eat, drink, chew gum or use tobacco at a scene.

- Consider the use of disposable personal protective equipment (PPE) such as gloves, masks, shoe covers, coveralls and hair covers when appropriate.

- Avoid skin and oral contact with investigatory tools such as measuring tapes or pens that may have contacted contaminated surfaces.

- Do not discard any trash in or near the crime scene such as cigarette butts, used disposable gloves, cups, or bottles.

- Take care when using cell phones/radios or other personal items.  Make sure not to use them when you have gloves on to avoid contamination.

## Storage of Biological Evidence (Short-Term)

The storage of biological evidence in this section pertains to the short-term storage that is necessary during all phases of investigation and litigation.

Biological evidence that has been dried should be stored in a facility that minimizes extreme heat and humidity, which can cause DNA to degrade.

Items that are dried and extremely odorous may be retained in a sealed plastic bag.

Biological evidence that cannot feasibly be dried should be stored frozen. However, items returned to the law enforcement governmental evidence-retention entity after laboratory analysis that are no longer frozen may be stored as dry material in a designated property room with little fluctuation in temperature and humidity. Whole blood should be spotted onto

sterile cloth, bloodstain card paper, or FTA paper by laboratory personnel for storage at room temperature.

All packages should be stored in a sealed condition that does not allow for cross contamination, loss or deleterious change. All seals must be marked to identify the person making the seal.

Packages from the same case should be stored in the fewest number of containers using boxes or large bags, with care taken to avoid contamination of evidence. For both storage and retention, boxes provide the most efficient use of space.

Note that some items of evidence containing biological evidence may be too large to reasonably store, especially for long periods of time. For items such as vehicles, mattresses, and other large items, it may be appropriate to photograph the item, clearly showing the location of the biological evidence, and then cut and remove the portion containing the biological material for testing and storage.

## Retention of Biological Evidence (Long-Term)

Retention of biological evidence and/or material pertains to long-term storage of evidence from inactive cases, cold cases or after litigation.

Long-term evidence retention should be part of the governmental evidence-retention entity's evidence control policy.

Whenever possible, all evidence from a case should be retained by one governmental evidence-retention entity.

All packages should be stored in a sealed condition that does not allow for cross contamination, loss or deleterious change. All seals must be marked to identify the person making the seal.

Packages from the same case should be stored in the fewest number of containers possible, such as boxes or large bags needed for that case, with care taken to avoid contamination of evidence. For storage and retention, boxes provide the most efficient use of space.

Items that are dried and extremely odorous may be retained in a sealed plastic bag.

Agency case numbers and identifiers must never be removed by another agency unless documented.

A container such as a box or bag containing multiple items or packages must only be used to store evidence from a single case and should be marked to reflect the contents of that container.

Any governmental evidence-retention entity retaining biological evidence must be able to produce an inventory of the evidence. It is best to maintain an evidence inventory in a computer management system that can be backed up. In the absence of such a system, an inventory based on chain-of-custody records must be maintained. It must list the item and its current location as well as document receipt and transfer of the evidence. It is recommended that the original investigating agency maintain the inventory for each case.

Governmental entities in counties with a population under 100,000 may deliver biological evidence to the Texas Department of Public Safety for storage. The address, phone number, and e-mail address of the DPS storage site will be posted on the DPS website at www.dps.texas.gov. Search the site under the heading of bio-evidence storage. Note that DPS storage is intended to be long term retention of the evidence. This would apply both to evidence after a person is convicted, and to evidence in a cold felony case. Agencies are

advised to store biological evidence locally until cases are adjudicated, so that the evidence is available for the pending trial.

## Biological Evidence Retention & Preservation Timeline

The retention and preservation schedule for biological evidence is described in Art.38.43 (c) Code of Criminal Procedure.

> *b)* *This article applies to a governmental or public entity or an individual, including a law enforcement agency, prosecutor's office, court, public hospital, or crime laboratory, that is charged with the collection, storage, preservation, analysis, or retrieval of biological evidence.*

> *c)* *An entity or individual described by Sub-section (b) shall ensure that biological evidence collected pursuant to an investigation or prosecution of a felony offense or conduct constituting a felony offense is retained and preserved.*

**It is important to note that the following retention schedules apply to both adult offenders of felony offenses and to juvenile offenders of conduct constituting a felony.**

The retention schedules for biological evidence and materials are provided below.

1. Unsolved: for not less than 40 years, or until the applicable statute of limitations has expired, if there is an un-apprehended actor associated with the offense.

2. Convictions: In a case in which a defendant has been convicted placed on deferred adjudication community supervision, or adjudicated as having engaged in delinquent conduct and there are no additional un-apprehended actors associated with the offense:

   > *a)* *until the inmate is executed, dies, or is released on parole, if the defendant is convicted of a capital felony.*

   > *b)* *until the defendant dies, completes the defendant's sentence, or is released on parole or mandatory supervision, if the defendant is sentenced to a term of confinement or imprisonment in the Texas Department of Criminal Justice.*

## Destruction of Biological Evidence

Art. 38.43 (d), Code of Criminal Procedure contains the provisions for destruction of biological evidence in cases resulting in the conviction of a person for a felony offense, as follows:

> *c)* *The attorney representing the state, clerk, or other officer in possession of biological evidence described by Subsection (a) may destroy the evidence, but only if the attorney, clerk, or officer by mail notifies the defendant, the last attorney of record for the defendant, and the convicting court of the decision to destroy the evidence and a written objection is not received by the attorney, clerk, or officer from the defendant, attorney of record, or court before the 91st day after the later of the following dates:*

> *1.* *The date on which the attorney representing the state, clerk, or other officer receives proof that the defendant received notice of the planned destruction of evidence; or*

> *2.* *The date on which notice of the planned destruction of evidence is mailed to the last attorney of record for the defendant.*

**See Appendix A for the format of a Notice of Intent to Destroy Biological Evidence.**

To augment the available storage space for retained biological or other evidence required by statute, it is recommended that each governmental evidence-retention entity routinely inventory its property room for evidence that could possibly be destroyed. Crimes that require adherence to these biological evidence retention standards are felony crimes.

When evidence is being held for cases on appeal, consult the prosecuting attorney for an updated status and the possibility of seeking a destruction order.

Questions in reference to cases that are open or unsolved should be referred to the prosecuting attorney to determine the statute of limitations and the possibility of future litigation or the possibility of seeking a destruction order.

## Cataloging of Retained Evidence

A governmental evidence-retention entity must have a system to catalog evidence so it is possible to locate any retained biological evidence.

A cataloging system should make use of a unique case numbering system, a documented procedure for property room organization and the evidence inventory developed for each case.

Evidence control should include a case numbering system. The case numbering system should include unique case identifiers with unique property identifiers.

The organization of the property room should be determined by the governmental evidence-retention entity's ability to locate the evidence through a computerized barcode system or hand written record.

# Exhibit H

## INTRODUCTION

Eight of the DPS Crime Laboratories provide biological case screening for the presence of blood and/or body fluids and STR (short tandem repeat) nuclear-based DNA testing on evidence from criminal investigations. Examinations performed will be based on the type of case submitted and the quality and quantity of forensic samples detected.

Biological evidence may be submitted to the Regional Crime Laboratories in Austin Headquarters, Corpus Christi, El Paso, Garland, Houston, Lubbock, Weslaco, and Waco.

Successful DNA results are dependent on the amount and condition of the evidentiary material. Factors such as extreme or environmental conditions to which the material has been exposed, substrate on which the material is found, and the exposure of the sample area to multiple individuals may affect DNA results and should be considered prior to submitting evidence for processing. For example, it is highly unlikely to obtain a DNA profile from the individual who originally loaded fired ammunition components (bullets or cartridge cases).

**The following determinations may be requested when submitting evidence for biological screening/DNA examinations:**

- **Presence of biological material (e.g. blood, semen, or other DNA-yielding stains)**

- **Presence of human DNA**

- **Comparison of DNA profiles obtained from questioned or crime scene samples to DNA profiles from known or reference samples.**

- **Preservation of trace evidence**

A laboratory report will be issued explaining results of analysis and relevant conclusions. For a DNA report, the laboratory will summarize the results of comparisons of DNA profiles which may include the significance of associations with known references.

Additionally, a DNA profile may be entered into the Combined DNA Index System (CODIS) database that contains DNA profiles from known individuals and forensic case samples. Profiles can be searched against other profiles for the purpose of helping to generate investigative leads.

**Please note that the submission of elimination samples, such as reference samples from a consensual partner in the case of a sexual assault, is requested prior to the entry of crime scene samples into CODIS. These standards should be collected during the initial investigation, packaged separately from the evidence, and should be submitted at the same time as the evidence if possible in order to facilitate timely laboratory response.**

## SAFETY CONSIDERATIONS

At a minimum, latex, nitrile, or other non-porous polymer gloves must be worn when recovering and packaging biological evidence. Additional personal protective equipment such as eye protection, face masks, head/hair covering, and lab coats may be beneficial for personal safety and to avoid contamination of the evidence.


All biological stains and reference samples should be treated as a biohazard (Universal Bloodborne Pathogen Precautions). These samples could potentially expose the handler to HIV, Hepatitis B and C, or other pathogens.

If blood samples are shipped such that they would be traveling by air, they must be packaged by IATA (International Air Transport Association) regulations.

## COLLECTION

The use of proper collection and evidence handling procedures reduces the possibility of evidence contamination and DNA degradation. Therefore, observe the following guidelines:

- Do not package known reference samples in the same packaging as questioned samples.

- Package individual items of clothing from the same person in separate containers.

- If the exact location of evidentiary DNA on an item is important, wrap the item in clean white paper and roll it up on itself prior to placing in a bag in order to prevent transfer of evidence from one location on the item to another location.

- Do not package evidence collected from one individual with evidence collected from a second individual.

- Do not package crime scene evidence with evidence collected from an individual.

- Wear gloves and change frequently, or when they become soiled.

- Avoid talking, coughing, or sneezing over the unpackaged evidence.

### Collection of Evidentiary Samples

Observe the following steps to collect evidence samples:

- Document and photograph the removal of stains.

- Use sterile swabs to absorb wet stains from non-absorptive surfaces.

- Cut out questioned stains from large items such as car seats and bedding.

- Dampen a sterile swab, using sterile water, to collect dry stains from walls or other larger items. Do not scrape dried stains. They can flake into dust and become static, making the particles difficult to handle.

- **IMPORTANT:** Air dry any wet items or swabs before packaging and sealing. If items cannot be dried prior to submission, the laboratory must be consulted.

- The collection of control swabs from the scene is not required. If submitted, these samples will not be processed through DNA analysis.

### Collection of Known Reference Samples

- Collect blood standards in purple top blood tubes labeled with the individual's name. Purple top blood tubes contain a chemical preservative, EDTA. Verify that the collection is prior to the expiration date on the tube.

- Collect buccal samples (swabbings of the inner cheeks of the mouth) onto at least two sterile cotton swabs and air dry prior to packaging. Buccal swabs from one individual do not need to be labeled as to the side from which they were collected and may be packaged together. To avoid possible contamination, allow the


individual to collect the sample him/herself in the presence of a witness. The packaging should list the individual's name.

- Information of suspected blood transfusions of the victim and/or suspect should be provided to the laboratory.

## PRESERVATION AND PACKAGING

Questioned stains and known reference samples naturally degrade. However, the degradation process may by be slowed by proper collection and preservation:

- Thoroughly **dry the wet or moist items**, such as clothing or swabs, before packaging.

- **Refrigerate liquid biological samples** until submission to the laboratory.

- **Freeze tissue samples** until transporting to the laboratory for submission.

- Package items in **white paper**.  <u>Do not use plastic packaging for biological evidence.</u>

- Store the packaged items in a cool, dry area.  Avoid sunlight, heat, and excessive humidity.

- **Refrigerate sexual assault kits** if they contain liquid samples, such as blood, until submitted to the laboratory.  If uncertain, the kits should be refrigerated.  <u>Do not freeze the kits.  Do not store the kit in hot conditions, such as the trunk of a car.  The heat may cause any blood tubes within the kit to explode.</u>

- Label and seal all packaging properly. **IMPORTANT:** Mark all packages with biological hazard stickers.



**Biohazard Warning Label**

- **Contact your local laboratory for specific instructions on collection, packaging, and submission procedures.**

## SUBMISSION OF BIOLOGICAL EVIDENCE

When submitting evidence to a DPS Crime Laboratory, please follow the DNA case and evidence acceptance policy - Criteria for DNA Evidence Submission, PEH-02-04A.

Generally, for bulky items such as bedding, mattresses, car seats, etc., please contact the laboratory prior to submission to determine relative importance, facilitate processing, and reduce storage space requirements.

Submit applicable supporting documentation:

- Offense reports and witness statements with the evidence

- Autopsy reports or medical records from the victim, when available and where applicable.

- Photographs and sketches of the crime scene, as necessary.



**Note: If the investigation and medical records and photographs are not submitted with the evidence, the examination of the case may be delayed while the analyst waits to receive these items from the submitting agency.**

## Submission of Evidence from Sexual Assaults

In the state of Texas, licensed physicians and Sexual Assault Nurse Examiners (SANE nurses) are authorized to collect samples from sexual assault victims.

Typical sexual assault kits may include the following:

- Orifice swabs (vaginal/oral/rectal) from victim (generally four per orifice) air dried at room temperature. Each orifice swab collection should be performed with multiple swabs simultaneously, unless conditions warrant otherwise. If the swabs are not collected simultaneously, they should be marked as to the order of collection.

- Vaginal, oral, or anal smears from victim

- Penile swabs from victim (if the victim is male). This consists of rubbing the outside of the penis with the swabs and is not the same method as collection of swabs for testing for STDs.

- Blood specimen from victim (one purple top [EDTA] tube or a one inch spot on FTA paper)

- Buccal specimen from victim (two swabs) air dried at room temperature

- Swabbings of areas of the victim's body which were either licked or bitten by the suspect during the assault (note location and supply the reasoning for their collection).

- Pubic hair combings from victim (note reason if not collected)

- Head hair combings from victim (note reason if not collected)

- Pulled pubic hair standard from victim (note reason if not collected)

- Pulled head hair standard from victim (note reason if not collected)

- Fingernail clippings from victim

- Undergarments from victim (especially panties immediately worn after the assault)

Other evidence may include:

- Blood specimen from suspect (one purple top [EDTA] tube or a one inch spot on FTA paper; or alternatively at least four buccal swabs may be collected from the suspect)

- Buccal sample from suspect (four swabs) air dried at room temperature

- Penile swabs from suspect (only if apprehended a short time after the assault occurred)

- Pubic hair combings from suspect (only if apprehended a short time after assault has occurred)

- Pulled pubic hair from suspect

- Pulled head hair from suspect, when applicable

- Clothing from suspect, when applicable

 
- Fingernail clippings or swabs of the suspect's fingers/hands, if victim was injured.

- Swabs of the suspect's fingers (only if apprehended a short time after assault has occurred).

Additional samples that may be collected from the victim if it is suspected that the victim may have been drugged: blood sample collected in a gray top tube and a urine specimen. These samples should be packaged separately from the victim's sexual assault kit and preferably in the DPS sanctioned blood and urine collection kits respectively. If blood alcohol and/or toxicological drug analysis is requested on the blood specimen within the kit, the request must be noted on the submission form. See PEH-02-03 Toxicology and Blood Alcohol Evidence for handling and submission information.

Include the information listed on the Sexual Assault Information Form (LAB-24) with the submission of the sexual assault evidence.

**Note: The Sexual Assault Information Form (LAB-24) is an aid for laboratory personnel to interpret items of evidence submitted by police officers or medical personnel.** This may be completed or a similar form may be found in the Texas Evidence Collection protocol published by the Office of Attorney General's Sexual Assault Prevention and Crisis Service Division. The following is a link to the protocol.

http://www.oag.state.tx.us/AG_Publications/pdfs/evidence_collection.pdf